■ In the Matter of NEWSDAY, INC., Appellant, v NEW YORK CITY POLICE DEPARTMENT et al., Respondents.—Order and judgment (one paper) of the Supreme Court, New York County (Shirley Fingerhood, J.), entered on or about May 8, 1986, which, in a proceeding under CPLR article 78 seeking various police reports pursuant to the Freedom of Information Law, denied disclosure of certain reports, affirmed, without costs.

The procedural history, facts and issues are fairly presented in the dissenting opinion.

In our view, affirmance is required by the decision of the Appellate Division, Fourth Department, in *Matter of Gannett Co. v James* (86 AD2d 744, *lv denied* 56 NY2d 502), which addressed essentially the same issue presented on this appeal, and whose conclusions were explicitly approved by the Court of Appeals in *Matter of Capital Newspapers Div. v Burns* (67 NY2d 562).

In *Matter of Gannett (supra),* the petitioners, publisher and certain reporters for a daily newspaper in the City of Rochester sought pursuant to the Freedom of Information Law (FOIL; Public Officers Law art 6) various categories of police records. These included complaints alleging harassment or use of force by police officers for a period of time, documents representing final disposition of civil service hearings concerning Police Department personnel with the names of the officers for a period of several years, documents reflecting final disposition of such hearings without the names of the officers, and copies of "Use of Force" forms filed by Rochester police officers for the years 1976-1979.

As to most of the records and documents requested, the Fourth Department, in *Matter of Gannett (supra),* in affirming

the dismissal of the petition, concluded that the documents constituted "personnel records, used to evaluate performance toward continued employment or promotion" under Civil Rights Law § 50-a (1). In addition, the court noted that these categories of documents are also exempt from disclosure under Public Officers Law § 87 (2), under provisions excluding disclosure of records which might interfere with law enforcement investigations, and which might identify a confidential source or disclose confidential information.

Finally, addressing the request for "Use of Force" forms, the court said (supra, at 745-746): "Lastly, the 'Use of Force' forms * * * while not personnel records used to evaluate performance, are nonetheless exempt from disclosure as intra-agency materials which are not statistical or factual tabulations or data, instructions to staff that affect the public or final agency policy or determinations (Public Officers Law, § 87, subd 2, par [g], cls i, ii, iii). This inter- or intra-agency exemption is important in that it permits police officers to express their views of events candidly and in writing."

Significantly, as the dissenting opinion makes clear, the "Use of Force" forms at issue in *Matter of Gannett (supra)* are quite similar to the records as to which disclosure was denied in this proceeding, and raise essentially the same legal issue. As already observed, the Court of Appeals denied leave to appeal from the determination in *Matter of Gannett.*

In *Matter of Capital Newspapers Div. v Burns (supra),* the Court of Appeals, in concluding that Civil Rights Law § 50-a did not grant a blanket exemption from the Freedom of Information Law with regard to disclosure of police personnel records sought by a nonlitigating newspaper, addressed the contention of a party that *Matter of Gannett (supra)* had so held. Speaking of *Matter of Gannett,* the Court of Appeals said (supra, at 569): "The result reached by the court was clearly correct, however, for each of the requests purportedly exempted from disclosure by section 50-a in that case were also exempt under other FOIL provisions, namely Public Officers Law § 87 (2) (e), (g); § 89 (3) * * * Thus, to the extent that the court held that section 50-a created a blanket exemption insulating police records from FOIL disclosure, its holding was unnecessary because statutory exemptions contained in other sections, which are generally available to public officials, adequately provided protection for the police in that case and should provide similar protection against future unwarranted requests."

We appreciate that in this quoted comment the Court of

Appeals was focusing primarily on that aspect of *Matter of Gannett (supra)* that had excluded from disclosure under FOIL certain documents on the basis of Civil Rights Law § 50-a. However, coupled with the circumstance that the Court of Appeals had denied leave to appeal from a decision which denied a request for records raising substantially the same issue as is presented in this proceeding, which separately has little precedential value, the explicit statement of the Court of Appeals in *Capital Newspapers (supra)* that the result reached in *Matter of Gannett* was correct, seems to us controlling on the central issue presented in this case. Concur—Sandler, J. P., Milonas and Rosenberger, JJ.

Carro and Smith, JJ., dissent in a memorandum by Smith, J., as follows: This proceeding, brought pursuant to CPLR article 78, involves the essence of the Freedom of Information Law (FOIL; Public Officers Law art 6). Because I believe the FOIL requires greater disclosure than was permitted by the motion court and because I believe that nothing in the Civil Rights Law prohibits such disclosure, I dissent.

Petitioner Newsday, Inc. began a comprehensive study of incidents in which police officers fired their guns while on or off duty. The petition in this proceeding describes the nature of the study and the records sought. Other documents also describe the records sought. Because a clear description of what is sought is essential to the grant or denial of the request, the written requests for information and other documents will be extensively quoted.

The petition describes the study and the information sought as follows:

"7. Pursuant to the New York Freedom of Information Law ('FOIL'), N.Y. Pub. Off. Law § 84 *et seq.* (1984), Newsday is seeking access to certain specific information which Newsday requires to report on matters of public interest and importance to Newsday's readers. There has been widespread public interest and concern relating to the number of shooting incidents by police officers. Newsday has planned to do an in-depth study of all such incidents to determine whether, upon analysis of the facts and circumstances disclosed by Police Department records, any pattern or trend arises and whether any change in regulations or applicable law is warranted. Any departmental problems that may exist will not be solved in locked files or behind a wall of silence.

"8. Upon information and belief, the following police department records and documents, within the custody and control

of the department, are relevant and necessary to the planned study:

"a. Firearms Discharge/Assault Reports for 1979 through 1984. Such reports must be prepared by police officers immediately after they fire their guns. The reports contain the police officer's recounting of the events surrounding the discharge of the weapon.

"b. Unusual Occurrence Reports for the years 1979 through 1984. These reports are prepared by the precinct duty officer within 24 hours of a police officer's discharge of a weapon.

"c. Additional Unusual Occurrence Reports for the years 1979 through 1984. These reports must be prepared by the precinct commander, based on his own investigation of the incident and based on the preceding reports.

"d. Summary reports prepared by the Office of the Chief of Operations for the years 1979 through 1984. These reports are based on all the preceding reports, and are forwarded to the Firearms Discharge Review Board for the borough in which the weapon discharge took place.

"e. Recommendations of the borough Firearms Review Board for the years 1979 through 1984. These reports are sent to the department-wide Firearms Review Board."

According to the verified petition, on February 6, 1985, two Newsday reporters, Jane Fritsch and Jennifer Preston, met with Alice McGillion, Deputy Commissioner for Public Information, New York City Police Department, "to seek information on all incidents, on-duty and off-duty, in which New York City police officers wounded or killed civilians during a six-year period." At the meeting and in a letter from Fritsch and Preston to McGillion, dated February 7, 1985, petitioner requested "copies of all Firearms Discharge/Assault Reports kept by the New York Police Department for the years 1979 through 1984." The February 7, 1985 letter also requested "copies of all reports stemming from these incidents prepared by duty officers, precinct commanders, the Office of the Chief of Operations, and the Firearms Discharge Review Board."

In a letter to Fritsch and Preston dated February 25, 1985, Eneta McAlister, Records Access Officer, Public Inquiry Section of the New York City Police Department, denied, with a limited exception, the information requested. Two reasons for the denial were given. First, the letter noted that section 87 (2) (a) of the Public Officers Law (FOIL) allowed "an agency the right to deny access to records that are specifically exempted from disclosure by state statute." The letter concluded

that, with the exception indicated below, the records were personnel records exempt from disclosure pursuant to section 50-a of the Civil Rights Law. Secondly, the letter concluded that the materials sought were "non-disclosable, since it is intra-agency material pursuant to Public Officers Law section 87 (2) (g)." The letter then stated that decisions of the Firearms Discharge Review Board would be supplied since they were final agency determinations within the meaning of section 87 (2) (g) (iii) of the Public Officers Law. Finally, the February 25, 1985 letter gave notice that an appeal could be made to the agency's appeal officer within 30 days as provided for in section 89 (4) (a) of the Public Officers Law.

Reporters Fritsch and Preston filed an appeal of the February 25, 1985 order by means of a letter, dated March 20, 1985, to Rosemary Carroll, Assistant Deputy Commissioner Legal Matters in the Police Department. The appeal requested documents as follows:

"The records that were denied were copies of all reports stemming from incidents in which New York police officers wounded or killed civilians from 1979 through 1984. Those records included:

"1. Firearms Discharge/Assault Reports prepared by police officers immediately after they fire their guns.

"2. Unusual Occurrence Reports, the narrative reports prepared by precinct duty officers within 24 hours of a shooting.

"3. Additional Unusual Occurrence Reports, prepared by the precinct commander within three days of the shooting incident.

"4. Summary reports prepared by the Office of the Chief of Operations.

"5. Recommendations of the borough-level Firearms Discharge Review Boards."

By a letter dated April 4, 1985, Robert Goldman, Deputy Commissioner Legal Matters, New York City Police Department, denied the appeal on the same basis as the Records Access Officer on February 25, 1985, i.e., that the material was "statutorily exempt from disclosure (Public Officers Law § 87 (2) (a)-Civil Rights Law § 50-a" and "non-disclosable since it is also intra-agency material (Public Officers Law § 87 (2) (g)."

In addition to the denials of February 25, 1985 and April 4, 1985, the defendants refused to answer questions asked. The verified answer states that at the February 6, 1985 meeting of reporters Jane Fritsch and Jennifer Preston with Alice McGillion, Deputy Commissioner for Public Information, the said

Commissioner suggested that the reporters submit a list of incidents in which they were interested and a list of questions they wanted answered about each incident. Sometime between February 7, 1985 and March 20, 1985, the reporters spoke to Sergeant Peter Sweeney of the Police Department, who was assigned to work with them. They gave him "a list of 12 questions regarding each of 163 incidents in which a police officer had shot and killed a perpetrator." In a letter dated March 20, 1985, the number of questions asked for each of the 163 incidents was expanded to 40. After negotiations with McGillion and Sweeney, the number of questions was reduced to 12. In response to this reduction, Deputy Commissioner Goldman allegedly told the reporters, on April 4, 1985, that no questions would be answered unless the reporters dropped their appeal on the FOIL request. On the same day, April 4, 1985, the appeal was denied.

Despite the official denials and the refusal to answer questions, the following information was provided to the petitioner:

"36. During the course of its ongoing communications with Newsday, the Police Department provided the reporters with the following information in addition to the information described in paragraph 32 *supra:* On March 6, 1985, the Police Department provided the reporters with a list of the 130 police officers who had received disciplinary charges for incidents involving firearms discharges for the years 1980-1984 inclusive. The list included the police officer's name, rank, and command, and the date of the occurrence which formed the basis for the disciplinary charges. Additionally, the reporters were allowed to inspect the records of the disciplinary proceedings of each of the 1,384 police officers who received disciplinary charges during the years 1982, 1983 and 1984. The Newsday reporters requested some of these records and were provided with copies of all the records they requested. On or about April 12, 1985 the reporters were given a list of all perpetrators shot and killed by a police officer. The list gave the name of the perpetrator shot, the name of the police officer, and the date of the incident. Additionally, on May 28, 1985, the Police Department provided the reporters with a list of individuals shot by police officers for the years 1983 and 1984. This list indicated the name of the person wounded, the name of the police officer, whether the police officer was on or off duty at the time of the occurrence, the precinct in which the incident occurred and the date of the occurrence.

"37. In June of 1985, the Newsday reporters submitted a list

of nine firearms discharge cases which they had a special interest in. The reporters requested interviews with 11 Police Department officials to discuss each of these incidents. The Police Department authorized a number of interviews but the scope of these interviews was limited to discussions of general policy. Specific incidents were not discussed. The reporters spoke to William Flack, Director Department Advocate's Office; Robert Johnston, the Police Department's Chief of Operations and Chairman of the Firearms Discharge Review Board; Lt. Stephen H. Friedlander, Instructor of Police Science at the Police Academy; Richard Koehler, Chief of Personnel; Commissioner Hugh Mo, Deputy Commissioner of Trials; and Inspector Burke and Sergeant Sweeney of the Police Department's Office of Public Information. The reporters were also authorized to interview Charles Adams, Executive Director of the Civilian Complaint Review Board but, on information and belief, the reporters did not speak to him because he was away on vacation. Also, on information and belief, the reporters did not follow up on their original request to speak to Daniel Sullivan, Head of the Police Department's Internal Affairs Division."

In addition to this information, the Police Department provided the petitioner "with copies of all the summary reports prepared by the office of the Chief of Operations concerning firearms discharge incidents and the Recommendations of the Borough Firearms Board." (Categories 4 and 5 of Mar. 20, 1985 letter to Rosemary Carroll, Assistant Deputy Commissioner Legal Matters, and material sought in paras 8d and 8e of verified petition and referred to in para 32 of verified answer.)

In the present article 78 proceeding, petitioner seeks firearm discharge assault reports, unusual occurrence reports, and additional unusual occurrence reports for the years 1979 through 1984 (categories 1, 2, and 3 of Mar. 20, 1985 letter to Rosemary Carroll, and material sought in paras 8a, 8b and 8c of verified petition).

With respect to the firearm discharge assault reports, the motion court determined that they are "intra-agency materials which are in part 'factual data' ". Without specifically determining that the firearm discharge assault reports were personnel records, the motion court determined that those reports should be redacted to eliminate identification information, and, as redacted, given to the petitioner. On the firearm discharge assault report forms used between 1979 and 1984, the motion court determined that the name, shield number,

command and tax registration number of the person who reported the incident and the name and signature of the station house officer should be removed. On those forms introduced in 1984, if any, the court ruled that the number of the line-of-duty injury report, the arrest number and the complaint number should be removed. On all of the firearm discharge assault reports, the motion court ruled that the narrative portions should be eliminated since they were exempt from disclosure pursuant to Public Officers Law § 87 (2) (g).

As for the unusual occurrence reports and the additional unusual occurrence reports, the motion court held that they should not be turned over since "they are predecisional material exempt from disclosure."

The firearm discharge assault report is a form which gives factual details about an incident where a police officer has been involved in the discharge of a weapon. It is filled out by a person who has discharged a weapon. The verified answer states that between 1979 and 1984, some 2,630 members of the police force were involved in incidents requiring the completion of the form. The verified answer gives a description of the form and the use which can be made of the form:

"39. Members of the service discharging a firearm are required to complete a discharge report. Up until January, 1984 members had to fill out the discharge report form attached hereto as Exhibit 'C.' In or about January, 1984 the report form was revised, and a copy of the revised form is attached hereto as Exhibit 'D.' Between 1979 and 1984, 2630 members of the service were involved in discharge incidents and had to complete a form. In addition to seeking personal data (height, weight, race, sex) and details of the firearms discharge (whether the officer had time to aim, whether it was necessary to reload, and whether the firearm was drawn and ready for use), both FIREARMS DISCHARGE/ASSAULT REPORT forms ask for a narrative description of the incident. Both forms also seek information that might be useful in firearms training. Copies of both forms are distributed to the Chief of Operations (Chairman of the Firearms Discharge Review Board); the Personnel Safety Desk; the Firearms and Tactics Section; and the Precinct file.

"40. As stated more fully in the accompanying affidavit of Chief of Personnel, Richard Koehler the information contained in the Firearm Discharge Report can be used to evaluate officers seeking promotions, transfers or heightened responsibilities or as a basis for disciplinary proceedings.

"41. Further, on the basis of the investigation commenced by the filing of a Discharge Report, the Area [Borough] Board can recommend the following corrective actions with respect to members of the service:

"a) A review of the laws and instructions issued in the discharge of firearms

"b) Additional firearms instruction

"c) Current assignment of officer reviewed

"d) Command Discipline, Charges and Specifications, Psychological Testing, Counseling, etc."

The unusual occurrence reports and additional unusual occurrence reports are made out by supervisors and other personnel concerning an occurrence, such as a shooting, which is out of the ordinary. They contain a description of the incident, statements of witnesses, and a conclusion as to whether the discharge of the weapon was within Department guidelines. Recommendations of disciplinary or other action are made. The verified answer contains a description of these forms and their use:

"42. An unusual occurrence is an occurrence which is substantially more significant than an ordinary occurrence because of its seriousness, peculiarities, sensationalism, vastness, differences or news worthiness (Exhibit 'F'). Whenever an unusual occurrence such as a firearms discharge occurs, a report must be written (Exhibit 'F').

"43. There is no printed form for an UNUSUAL OCCURRENCE REPORT. In the case of incidents involving firearms discharge, supervisors writing UNUSUAL OCCURRENCE REPORTS are asked to provide, *inter alia,* the following information:

"a) The opening paragraph of a report made under Patrol Guide 116-20 should summarize the basic incident in concise terms; time, date, location, name of member of the service, shield number, command, number of shots fired, at whom, and for what reason.

"b) Explain the events leading up to, during, and following the incident. Use descriptive matter necessary to clarify the facts and to support the basis for your conclusion (Who, What, When, Where, Why, and How). If a member of the service is off-duty, obtain last tour performed, next tour of duty, and indicate where member was coming from or going to.

"c) Detail the extent of the investigation conducted and identify all persons involved, e.g., District Attorney, detectives, etc., and notifications made * * *

"f) Insure that statements from members of the service and all witnesses are complete and exact. What did the civilian witness hear or see relative to the actual discharge? If no civilian witnesses are available, what attempts were made, and by whom, to locate civilian witnesses? If you are still unable to locate civilian witnesses, submit a list of all persons contacted, including their names and addresses * * *

"h) State member of the service's pedigree, disciplinary record and Department Recognitions awarded, if any. <u>DO NOT</u> Discipline * * *

"p) In all cases where the member of the service claims that the shot discharged was 'accidental,' indicate if there was any contributory negligence on the officer's part, e.g., was weapon cocked?; did member have finger on trigger when he slipped?, etc.

"q) In the final paragraph, specify if the discharge was within Department Guidelines. BE SPECIFIC. If not within Guidelines, make appropriate recommendation(s), e.g., 'no corrective action,' 'retraining,' 'disciplinary action'; etc. If disciplinary action is recommended, specify if it is Command Discipline or Charges and Specification. Remember, the Commanding Officer or Duty Captain will only <u>recommend</u> appropriate action. Final determination of action to be taken will be made by the Firearms Discharge Review Board.

"r) There are, however, two instances where immediate appropriate action can be taken by the Commanding Officer or Duty captain: first, where a member of the service is suspended (see Patrol Guide 118-5), and, second, where a member is referred to the Counselling Unit.

"s) Note that restrictions outlined in paragraph 'q' do not preclude a Commanding Officer or Duty Captain from instituting immediate disciplinary action for ancillary actions not directly related to the actual shooting, e.g., 'off post,' 'out of residence while on sick report,' 'unauthorized gun,' etc.

"(Exhibit 'G' annexed hereto)

## "Follow-up (sometimes referred to herein as Additional) Unusual Occurrence Reports

"44. FOLLOW-UP UNUSUAL OCCURRENCE REPORTS may contain the following information:

"a) Information listed in the initial report will not be

reported or answered again in the follow-up report required by Administrative Guide 316-17. However, if upon further investigation, the facts that were initially reported are found to be incomplete or erroneous, they will be corrected and included in the follow-up. Include in the Administrative Guide 316-17 report required information that is missing in original report and any new information developed as a result of the follow-up investigation.

"b) If an interview with a member of the service could not be conducted during the initial investigation (e.g., member injured, upon advice of counsel, etc.), such interview will be conducted in the follow-up investigation; statements made will be included in the report.

"c) Conduct an informal interview with member concerned as to his/her welfare, offering any assistance available through Employee Welfare Program (see Interim Order #40 s8e). If member is not assigned to your command, verify that member's Commanding Officer has complied with I.O. 42 s82, and indicate same in report.

"d) When a shooting incident involves a homicide, include the findings of the Grand Jury, the Assistant District Attorney presenting the case, and the date of presentation in the follow-up report.

"e) In the concluding paragraph of follow-up report indicate if shooting was within Department guidelines and include appropriate recommendations."

The issues on this appeal are (1) whether article 6 of the Public Officers Law and section 50-a of the Civil Rights Law require redaction of the firearm discharge aasault report and (2) whether article 6 of the Public Officers Law requires the redaction of portions of the firearm discharge assault reports and the denial of access to the unusual occurrence reports and additional unusual occurrence reports.

One of the fundamental reasons for the Freedom of Information Law is the belief that an open government is a free government. The New York State Legislature recognized this in its legislative declaration to FOIL (Public Officers Law § 84):

"The legislature hereby finds that a free society is maintained when government is responsive and responsible to the public, and when the public is aware of governmental actions. The more open a government is with its citizenry, the greater

the understanding and participation of the public in government * * *

"The people's right to know the process of governmental decision-making and to review the documents and statistics leading to determinations is basic to our society. Access to such information should not be thwarted by shrouding it with the cloak of secrecy or confidentiality.

"The legislature therefore declares that government is the public's business and that the public, individually and collectively and represented by a free press, should have access to the records of government in accordance with the provisions of this article."

The materials sought in this proceeding clearly fall within the definition of records contained in Public Officers Law § 86 and must be turned over absent an exemption provided for in article 6. "Record" is defined in section 86 (4) as "any information kept, held, filed, produced or reproduced by, with or for an agency or the state legislature, in any physical form whatsoever including, but not limited to, reports, statements, examinations, memoranda, opinions, folders, files, books, manuals, pamphlets, forms, papers, designs, drawings, maps, photos, letters, microfilms, computer tapes or discs, rules, regulations or codes."

FOIL provides that an agency may deny access to records, or portions of records that "are specifically exempted from disclosure by state or federal statute" (Public Officers Law § 87 [2] [a]). Civil Rights Law § 50-a (1) provides, in pertinent part, "All personnel records, used to evaluate performance toward continued employment or promotion, under the control of any police agency * * * shall be considered confidential and not subject to inspection or review without the express written consent of such police officer * * * except as may be mandated by lawful court order."

The firearm discharge assault reports, as described herein, are not personnel records of the kind which cannot be disclosed pursuant to Civil Rights Law § 50-a. They are not records containing background checks, medical records, performance records or financial records. The fact that a document contains information which identifies an officer involved in an incident or that the document may be used in determinations concerning discipline or promotion does not make it a personnel record. If such a document were held to be a personnel record, it would defeat the very purpose of open government

intended by FOIL. The only portions of the firearm discharge assault records which should not be disclosed are the tax registration numbers of the officers since this information is highly personal and of no relevance to the study undertaken by the petitioner. Thus the name, shield number and command of the person who reports the incident, as well as the name and signature of the station house officer, should be disclosed. Moreover, for those forms introduced in 1984, if any, the number of the line-of-duty injury report, the arrest number and the complaint number should be disclosed.

Moreover, section 50-a of the Civil Rights Law does not foreclose the disclosure of all personnel records of police officers in nonlitigation situations. *(See, Matter of Capital Newspapers Div. v Burns,* 67 NY2d 562 [1986].) In that case the Court of Appeals held that Civil Rights Law § 50-a should not be construed to exempt a police officer's "Lost Time Report" from disclosure as a personnel record in a nonlitigation context where a demand was made pursuant to the Freedom of Information Law. The court reviewed the "narrowly specific" legislative intent underlying the enactment of Civil Rights Law § 50-a, which was " 'to prevent time-consuming and perhaps vexatious investigation into irrelevant collateral matters in the context of a civil or criminal action' " *(supra,* at 569). The Court of Appeals based its holding on FOIL's presumption of access to information and the court's practice of construing FOIL exemptions narrowly.

The motion court inferred, without specifically stating, that the firearm discharge assault reports were personnel records and ordered that information identifying the officer be redacted. This determination was erroneous since these documents are not exempt from disclosure as personnel records protected by Civil Rights Law § 50-a, particularly in light of FOIL's presumption of access, the judicial practice of construing FOIL exemptions narrowly and the fact that this is a nonlitigation context under Public Officers Law article 6.

The motion court also held that the narrative section of the firearm discharge assault reports, as well as the entire unusual occurrence reports or additional unusual occurrence reports, were exempt from disclosure pursuant to the Public Officers Law as intraagency materials. Public Officers Law § 87 (2) (g) provides that an agency may deny access to records or portions thereof which are interagency or intraagency materials which are not:

"i. statistical or factual tabulations or data;

"ii. instructions to staff that affect the public; or

"iii. final agency policy or determinations".

The narrative section of the firearm discharge assault reports, as well as portions of the unusual occurrence reports and additional unusual occurrence reports, as described above, contains factual data not exempt pursuant to this statute. These reports contain factual descriptions of incidents and occurrences and these portions of the reports should be available to petitioner. The statute specifically provides that an agency can deny access to records or portions of records which are not statistical or factual tabulations or data. Nothing in this provision indicates that an entire record can be exempt from disclosure where it contains both factual and nonfactual information. Even if a document contains exempt portions, the remainder of the document must be disclosed. (Public Officers Law § 87 [2] [g] [i]; *Ingram v Axelrod,* 90 AD2d 568 [3d Dept 1982]; *Matter of Polansky v Regan,* 81 AD2d 102 [3d Dept 1981].)

*Matter of Gannett Co. v James* (86 AD2d 744, *lv denied* 56 NY2d 502) is not authority for the denial of the documents requested here. There a newspaper with circulation in and around the City of Rochester sought certain records as follows (86 AD2d, *supra,* at 744-745): "(1) complaints made to the Internal Affairs Division of the Rochester Police Department alleging harassment or use of force by police officers for the past two years; (2) copies of 'Use of Force' forms filed by Rochester police officers for the years 1976-1979; (3) complaints to the Internal Affairs Division of the Monroe County Sheriff's Department alleging harassment or use of force; (4) documents forwarded to the Monroe County Civil Service Commission by the Rochester Police Department concerning disciplinary action taken against its police officers; (5) documents reflecting the final disposition of civil service hearings concerning Rochester Police Department personnel with the names of officers for the years 1976-1980; and (6) documents reflecting the final disposition of civil service hearings concerning Rochester Police Department personnel for the years 1976-1980, without the names of the officers."

As noted by the majority, the Appellate Division, Fourth Department, denied some of the listed documents on the basis that they were personnel records exempt from disclosure. It also made the following comment with respect to use of force

forms: "Lastly, the 'Use of Force' forms (request [2] above), while not personnel records used to evaluate performance, are nonetheless exempt from disclosure as intra-agency materials which are not statistical or factual tabulations or data, instructions to staff that affect the public or final agency policy or determinations (Public Officers Law, § 87, subd 2, par [g], cls i, ii, iii). This inter- or intra-agency exemption is important in that it permits police officers to express their views of events candidly and in writing." *(Supra,* at 745-746.)

The Court of Appeals denied leave to appeal the decision in *Matter of Gannett (supra).* In the subsequent decision of *Matter of Capital Newspapers Div. v Burns* (67 NY2d 562, *supra),* the Court of Appeals noted that the documents sought in *Matter of Gannett* could not receive a blanket exemption from disclosure on the grounds that they were personnel records. The Court of Appeals also made the statement that the result reached by the *Gannett* court was correct because the documents sought there were exempt from disclosure under Public Officers Law § 87 (2) (e), (g); § 89 (3). It is noted, however, that the holding of the Court of Appeals in *Matter of Capital Newspapers Div. v Burns* was that the lost time report of a police officer was not exempt from disclosure under FOIL and the actual use of force form at issue in *Matter of Gannett* was not before the court.

A review of the actual use of force form at issue in *Matter of Gannett (supra)* reveals that it is a factual document which can be disclosed under Public Officers Law § 87 (2) (g). The use of force form, as indicated in the record on appeal in *Matter of Gannett,* is as follows:

"ROCHESTER POLICE DEPARTMENT
"REPORT OF USE OF FORCE

"1. Date of Incident _____ Time _____ CR No._____
"2. Location of Incident_____
"3. Person On Whom Force Was Used_____
"4. Address of Person_____
"5. DOB____Height____Weight____Sex____Descent____
"6. Charge_____
"7. Was Officer injured?  Yes __ No __ if yes, describe on
                          RPD form 1068
"8. Describe Force Used_____
"9. Why was Force Necessary to Effect Arrest?_____
"10. Was person Handcuffed? Yes __ No __ Before Force __
                                          After Force __

"11. Instrument of Force Used (Including Mace)_____

"12. If Mace Used, Was Water Dispenser Used? Yes__ No__

"13. Was Mace Effective? Yes ___ No ___ (Explain on Reverse Side)

"14. Was Medical Treatment Given As A Result of Force Used? Yes ___ No ___

"15. Was Medical Treatment Refused? Yes ___ No__ (Explain on reverse side)

"16. Was Prisoner injured before force was used? Yes__ No__ (Explain on reverse side)

"17. Where was medical treatment administered?_____

"18. Attending Physician _____ Address _____

"19. Were Others Arrested At Same Time? Yes ___ No _____ if yes, list name(s) below

"20. Name _____ Sex ____ Name _____ Sex ____

"21. Address _____ Address _____

"22. Charge _____ Charge _____

"Copies: 1 Dep. Chief of Unit Involved Reporting Officer
          1 Unit Commanding Officer Unit Badge # IBM #
          1 Internal Affairs Section Reviewed by Date".

The only question on the form which calls for an opinion, in addition to facts, is number 9 which asks, "Why Was Force Necessary to Effect Arrest?" The answer to that question, in those cases where force is used, is not shielded from public view by FOIL.

I respectfully dissent.